**11**

ASK LAW OFFICES®
Alan Scott Koenig, Esq. (#44263)
P.O. Box 1170
Berkeley, CA 94701-1170
Telephone:  (510) 845-8968
Email: alan@asklaw.com

David I. Katzen, CSB # 79090
David A. Schuricht, CSB # 62690
KATZEN & SCHURICHT
1990 N. California Blvd., Suite 600
Walnut Creek, CA  94596-3744
Telephone:  (925) 831-8254 or 279-3080
Email: ksf@ksfirm.com

Counsel for Secured Creditor Bank Midwest, N.A.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>YOUSIF H. HALLOUM,<br><br>    Debtor.<br><br>Tax I.D. # xxx-xx-2986 | Case No. 12-21477<br>Chapter 7<br>D.C. No. DIK-2<br><br>**BANK MIDWEST'S OPPOSITION TO RECONVERSION TO CHAPTER 7**<br><br>Date/Time: Feb. 26, 2014 @ 10:00 a.m.<br>Ctrm 35, Dept. C, 501 I St., Sacramento, CA<br>Honorable Christopher M. Klein |

On February 12, 2014, the Court converted the above-captioned case of debtor Yousif H. Halloum ("Debtor") to chapter 7.  Debtor has moved for reconsideration and reconversion.  Doc 505.  Principal creditor Bank Midwest[1] opposes any relapse to chapter 11.  Because the Court well knows the tortured history of this bankruptcy before conversion, the bank will confine this submission to developments since then.  At bottom, they reinforce the conclusion that Debtor cannot reorganize and that returning to such a pointless exercise would squander constructive efforts made after February 12.

---

[1] Consistent with prior practice, "Bank Midwest" refers to the successor to the primary lending relationship in this bankruptcy, creditor Community Banks of Colorado, an operating division of real party in interest Bank Midwest, N.A., which is now known as NBH Bank, N.A.

**1**       Debtor's case was converted to chapter 7 for cause, primarily his intransigent refusal

**2** (despite prodding by his erstwhile counsel and trustee Michael G. Kasolas ("the Trustee")) to

**3** adopt reasonable terms for treating Bank Midwest's secured claim. In seeking to undo the

**4** conversion, Debtor has said he belatedly realized that agreeing to the bank's proposed terms

**5** would be preferable, but Bank Midwest declined to turn the clock back. Debtor further said he

**6** would propose an amended plan and pursue its confirmation.

**7**       Although this case is now in chapter 7, Debtor has indeed filed (but not served) two more

**8** amended chapter 11 plans and disclosure statements (but no redlines). Docs 518, 519, 521, 522.

**9** One might suppose that, chastened by the Court's rebuke, Debtor would faithfully integrate all

**10** the provisions which Bank Midwest reluctantly said it would accede to before the conversion—

**11** especially the all-important remedies structure—but *not* our obdurate Debtor. Instead, although

**12** the latest plans do appear to contain *part* of the bank-developed text, they excludes more than

**13** half that language (nearly 7 double-spaced pages!), thereby again rendering the default remedies

**14** imprecise and potentially anemic. Below, for the Court's reference, is the full treatment section

**15** as bank counsel transmitted it to Debtor's then-counsel and the Trustee's attorneys on Febru-

**16** ary 7—*none* of which beyond subparagraph (8)(c) appears in Debtor's latest plans:

> **CLASS 2A**: Notwithstanding anything to the contrary anywhere in this Plan, the treatment of the Class 2A claim (currently held by Community Banks of Colorado, an operating division of real party in interest Bank Midwest, N.A., which is now known as NBH Bank, N.A, and is referred to here as "Bank Midwest," a term intended to mean whoever may be the holder of the Class 2A claim from time to time) shall be as set forth in the following paragraphs (1) through (9). (For clarity, the entire treatment text for Class 2A is referred to as "§ T-2A," and references to specific elements in § T-2A are preceded by the "¶" character (*e.g.*, "¶ (1)"):
>
> (1) <u>Lien Retention</u>: Except as provided in the following sentence, Bank Midwest shall retain its liens on all real and personal property encompassed by the documents identified in ¶ (3), including property acquired before or after commencement of Debtor's case on January 26, 2012, and such liens shall continue to secure all amounts due under such documents unless and until Debtor has fully paid the Class 2A claim in accord with ¶ (6). Provided Debtor is in full compliance with § T-2A, Debtor may use cash collateral arising from Debtor's normal business operations (a) for expenses incurred in the ordinary course of Debtor's business commonly known as Flag City ARCO & Subway ("Business"), located on the realty commonly known as 14931 Flag City Boulevard, Lodi, California 95242-9313 ("Realty"); (b) to pay other claims in accord with this Plan;

and (c) to provide for compensation to Debtor of $3,000 per month.  Except as provided in the foregoing sentence, and unless and until Debtor has fully paid the Class 2A claim in accord with ¶ (6), the use of any cash collateral for purposes other than performing duties under § T-2A is not permitted and, except with Bank Midwest's express written consent, shall constitute a default for purposes of ¶ (8)(d).  (To illustrate, and without limiting the reach of the foregoing sentence, such a default would arise from use of cash collateral to make gifts (aside from nominal tokens in conventional settings) or investments (such as stock trading) not directly necessary to operation of the Business; to pay other claims under this Plan either in amounts or at times not explicitly required by the Plan or to pay such claims at any time when Debtor is *not* in full compliance with § T-2A; or to provide compensation to Debtor exceeding $3,000 per month (unless the excess above $3,000 in any calendar month is less than the amount by which the mean compensation over the prior three calendar months was below $3,000).)

(2) <u>Restraint on Further Encumbrance</u>:  Except (a) for purchase-money financing on new equipment (where "new" excludes replacements for equipment Debtor had as of the Effective Date) or (b) with Bank Midwest's prior express written consent, Debtor shall *not* incur any obligation that is or purports to be secured by property subject to any lien preserved under ¶ (1).  On or before the Effective Date, Debtor shall deliver to Bank Midwest a properly executed and notarized memorandum of understanding acceptable to the San Joaquin County Recorder ("MOU") that recites the foregoing prohibition and is [in form and substance acceptable to Bank Midwest] [in the form attached to the Plan as Exhibit ___].

(3) <u>Contract Etc. Rights Retention</u>:  Except as otherwise provided in § T-2A, Bank Midwest shall retain unaltered all of the legal, equitable, and contractual rights afforded by any of (a) Debtor and Bank Midwest's Business Loan Agreement dated June 21, 2005; (b) Debtor's Deed of Trust of the same date; (c) the parties' Commercial Security Agreement of the same date; (d) Related Documents as defined in any of the foregoing; or (e) the parties' Change in Terms Agreement dated September 29, 2010.

(4) <u>Allowed Secured & Residual Claims</u>:  For purposes of this Plan, Bank Midwest shall have (a) an allowed secured claim in Class 2A of $2,048,350—with no further deductions, offsets, or adjustments on account of payments from Debtor at any time before the Effective Date, on account of liens held by others, or on account of claims held by Debtor or his estate, *all of which claims held by Debtor or his estate (whether now known or unknown) are hereby fully and finally waived and released*; and (b) an allowed unsecured claim in Class 5 of $911,671.45 (with no deductions, offsets, or adjustments whatsoever), comprised of (i) an unsecured balance of $614,298.96 due under the documents identified in ¶ (3) ("Deficiency Claim") and (ii) a never-secured claim of $297,372.49 attributable to a prepetition overdraft of Debtor's checking account at the predecessor to Bank Midwest.  The allowed unsecured claim (including the Deficiency Claim) shall be treated with other claims in Class 5, *but* the Deficiency Claim shall remain secured by the liens preserved under ¶ (1) (that is, no such lien shall be considered "stripped" or removed as to the Deficiency Claim, nor shall any affected property be considered or deemed to revest or to be transferred free of such lien) unless and until Debtor has fully paid the Class 2A claim in accord with ¶ (6).  Nothing in this ¶ (4) shall preclude Bank Midwest from asserting claims greater than those allowed here

(5) <u>Interest</u>:  Bank Midwest's Class 2A claim shall bear interest at a variable rate of 1% (*i.e.*, 100 basis points) above the Prime Rate as published in the Wall Street Journal, determined and calculated as provided in the parties' Change in Terms Agreement identified in clause (e) of ¶ (3), except that the rate shall never be less than 4.75% per annum nor more than 5.75% per annum.

(6) <u>Payment Terms</u>:  Bank Midwest's Class 2A claim shall be paid in monthly installments, the first one due 30 days after the Effective Date and subsequent installments due on the same calendar day of ensuing months, amortized over 25 years, but the full remaining balance of the Class 2A claim (including accrued interest and all other fees, costs, or expenses provided for in any of the documents identified in ¶ (3)) shall be due five years after the initial installment is due.  Unless adjusted after a change in the interest rate, each monthly installment shall be in the amount of $_____.  Unless otherwise agreed or directed by Bank Midwest in writing, installments (a) shall be made by check payable to ""Community Banks of Colorado," with a memo line reading "Halloum Plan Payment," and (b) shall be delivered as provided in ¶ (9)(a)(i).

(7) <u>Requisite Notice of Certain Payments</u>:  Not later than 15 calendar days after the date on which they fall due under the Plan or under applicable nonbankruptcy law, whichever date is later, Debtor shall provide Bank Midwest with proof that he has paid (a) amounts necessary to cure property tax arrearages secured by the Realty; (b) property taxes secured by the Realty that first became or become due after January 26, 2012; and (c) premiums necessary to maintain commercially usual and customary fire and casualty insurance against damage to, or loss in the value of, Bank Midwest's collateral in an amount not less than $2,500,000.  For purposes of the foregoing sentence, "proof" of payment shall consist of (d) true and correct copies of the front and back sides of a cancelled check in the requisite amount and payable to the appropriate payee or (e) such other evidence as Bank Midwest may have already stated (in a writing delivered to Debtor before such proof is due) that it will consider sufficient to meet the requirement.

(8) <u>Remedies</u>:  All of Bank Midwest's foreclosure proceedings on real property pending on the Effective Date shall be deemed rescinded, and a Notice of Rescission of Notice of Default shall be recorded to confirm the rescission within 30 days after the Effective Date.  Except as otherwise provided in ¶ (8)(m), enforcement of Bank Midwest's rights under § T-2A shall be governed as follows in sub¶¶ (8)(a) through (8)(*l*):

(a) <u>Stay Relief</u>:  On the Effective Date, and without any further order, Bank Midwest shall have full relief from the automatic stay to do anything and everything reasonably necessary to protect or recover its collateral should Debtor not perform in accord with § T-2A (*e.g.*, to record or file a notice concerning Bank Midwest's lien rights [*e.g.*, the MOU under ¶ (2)], to give a default notice under ¶ (8)(e), to demand delivery of the Lieu Deed and Bill of Sale (identified in ¶ (8)(b) immediately below) under ¶ (8)(*i*), to record the Lieu Deed, to sue for possession of the Realty and any or all of its personal property collateral, to foreclose on any of its security to clear title if need be, and to follow procedures applicable to performance issues subject to ¶ (8)(m)).

      (b) <u>Lieu Deed & Bill of Sale</u>:  On or before the Effective Date, Debtor shall deliver to the Escrow (see ¶ (8)(c) below) a properly executed and notarized (i) Deed in Lieu of Foreclosure of the Realty ("Lieu Deed") and (ii) Bill of Sale as to all personalty subject to any lien preserved under ¶ (1) ("Bill of Sale"), [both in form and substance acceptable to Bank Midwest] [in the forms attached to the Plan as Exhibits ___ and ___, respectively].

      (c) <u>Escrow</u>:  The entity required to hold and deliver (or to return) the Lieu Deed and Bill of Sale under this Plan is referred to as the Escrow.  The initial Escrow is Michael J. Kasolas ("Kasolas"), whose written acceptance of that role is a prerequisite to confirmation of the Plan.  If Kasolas (or any successor) becomes unable to serve as the Escrow, a successor willing to assume the role may be designated by Debtor and Bank Midwest jointly or, on request by either of them (with notice to the other), such designation shall be made by the United States trustee or the Court.  The sole duty of the Escrow shall be to deliver or to return the Lieu Deed and Bill of Sale as provided in ¶ (8)(*i*) or ¶ (8)(*l*), whichever applies, and the Escrow shall only be liable (if at all) for damages proximately caused by deficient or improper performance of that duty.  In any proceeding brought against the Escrow to enforce that duty, or to recover for deficient or improper performance, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses and, unless otherwise agreed by the Escrow in writing, dismissal of a complaint against the Escrow shall render the Escrow the prevailing party in that action or proceeding.  Except insofar as the Escrow acknowledges deficient or improper performance of the Escrow's delivery or return duty, or the Court or other appropriate tribunal determines that such performance was deficient or improper, Debtor shall fully indemnify the Escrow against any liability or loss that is not already compensable (by Debtor or Bank Midwest) under the prevailing party provision in the foregoing sentence.  On or before the Effective Date, Debtor shall remit $500 to the Escrow as compensation for required services (and reimbursement of attendant expenses), which sum shall be deemed earned when the Lieu Deed and Bill of Sale have been properly delivered as provided in ¶ (8)(*i*) or properly returned under ¶ (8)(*l*).

      (d) <u>Actionable Default</u>:  Any of the following, if not timely cured, shall constitute a default by Debtor that entitles Bank Midwest to delivery of the Lieu Deed and Bill of Sale under ¶ (8)(*i*):

      (i) failure to make any payment required under ¶ (6) (that is, any monthly installment or the balloon balance) on or before the date due;

      (ii) failure to make any payment to cure property tax arrearages secured by the Realty on or before the date due under the Plan;

      (iii) failure to pay property taxes secured by the Realty that first became or become due after January 26, 2012, on or before the date due under applicable nonbankruptcy law;

      (iv) failure to pay premiums necessary to maintain commercially usual and customary fire and casualty insurance against damage to, or loss in the value of, Bank Midwest's collateral in an amount not less than $2,500,000 on or before the date such premiums are due under applicable nonbankruptcy law or agreements;

(v) failure to provide any proof of payment required under ¶ (7) on or before the date such proof is due;

(vi) use of cash collateral not authorized under ¶ (1), other than to pay non-Class 2A claims in accord with this Plan *if* such use was made at a time when Debtor had not been notified of a failure to comply with § T-2A and was not aware of his failure to do so;

(vii) failure to comply with any environmental law or regulation that is designed to protect Bank Midwest's collateral from contamination (and attendant value loss); or

(viii) failure to maintain any of Bank Midwest's collateral in good order.

(e) <u>Default Notice</u>:  If Bank Midwest believes Debtor is in default under ¶ (8)(d), Bank Midwest may give Debtor a notice of such default, which shall be directed to Debtor and transmitted to him by ordinary first-class mail (postage prepaid) *and* by email, all addressed as provided in ¶ (9)(b).  The notice shall be labeled (either in an email "subject" line or near the top of the text) "Notice of Default--Plan § T-2A."  The notice shall reasonably identify the nature of the asserted default, and although not necessary for that purpose, a notice that states "Default under Plan § T-2A ¶ (8)(d)(___)" (where the blank is filled with the relevant lower-case Roman numeral from the foregoing ¶ (8)(d)) and states the relevant performance item and (where relevant) due date (*e.g.*, "monthly installment due mm/dd/yy" or "tax payment proof due mm/dd/yy") shall be deemed sufficient.

(f) <u>Cure Opportunity/Process</u>:  Except as otherwise indicated in this ¶ (8)(f), Debtor shall have 60 calendar days in which to cure defaults of which Bank Midwest gives notice under the foregoing ¶ (8)(e), commencing on the date such notice is sent to him by email, with the exception that Debtor may not cure an improper use of cash collateral that constitutes a default under clause (vi) of ¶ (8)(e).  For a default under clause (vii) or (viii) of ¶ (8)(e), if the cure requires more than 60 days, Debtor may cure if, immediately after receiving notice under ¶ (8)(e), Debtor initiates steps that Bank Midwest (in its discretion, exercised in good faith) considers sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

(g) <u>Cure Confirmation Request</u>:  If Debtor believes a default has been cured, or that steps sufficient to extend the time for cure have been taken under the last sentence of ¶ (8)(f), Debtor may send Bank Midwest a request to accept the cure (or to acknowledge that steps sufficient to extend the time for cure have been taken under the last sentence of ¶ (8)(f)).  Any such request (i) must be labeled "Asserted Cure of Halloum Default--Plan § T-2A"; (ii) must be transmitted by email as prescribed in ¶ (9)(a)(ii); and (iii) must (A) identify the default ostensibly cured; (B) specify what has been done to cure, with documentary support where relevant; (C) request acceptance or rejection of the cure (or acknowledgement that steps sufficient to extend the time for cure have been taken under the last sentence of ¶ (8)(f)) within five business days; and (D) provide an email address to which the response should be sent.  If Bank Midwest fails to reply within five business days, Debtor's cure opportunity under ¶ (8)(f) shall be extended by one day for each day beyond five business days that Bank Midwest fails to reply.

(h) <u>Cure Disputes</u>:  If Bank Midwest rejects a purported cure but Debtor contends it was sufficient, the Court presiding over Debtor's bankruptcy shall retain jurisdiction to resolve the matter on Debtor's request.  On 10 days' notice to Bank Midwest, Debtor may request a temporary stay by making a prima facie showing of cure (or of steps sufficient to extend the time for cure under the last sentence of ¶ (8)(f)).  Unless the Court orders otherwise for cause shown by Debtor, any final determination about whether the cure was sufficient must be made within 30 days of such a temporary stay, failing which the stay shall expire automatically, and Debtor's cure shall be deemed inadequate except as otherwise provided in the last sentence of ¶ (8)(*i*).

(*i*) <u>Bank Midwest's Request for Lieu Deed Delivery</u>:  If Bank Midwest has given a default notice under ¶ (8)(e) and has determined that the default has not been cured within the time provided by ¶ (8)(f) (or that the default is not curable), then—unless it has received an order imposing a stay that is in force under ¶ (8)(h)—Bank Midwest may request delivery of the Lieu Deed and Bill of Sale.  Such a request must be signed or otherwise authenticated by an officer of Bank Midwest or by Bank Midwest's counsel of record in Debtor's bankruptcy, must be delivered to the Escrow, and must state as follows:

**Request for Delivery of Halloum Lieu Deed After Default**

**TO**:  Escrow ("Escrow") under Chapter 11 Plan ("Plan") of Yousif Halloum ("Debtor")

**FROM**:  Bank Midwest

Debtor has defaulted under Plan § T-2A, and the default has not been cured within the time (if any) permitted.  Bank Midwest is not aware of any order from the Bankruptcy Court presiding over Debtor's case that stays relief for Debtor's default.

Therefore, Bank Midwest hereby requests that the Escrow deliver the original Lieu Deed and Bill of Sale (as those terms are defined in Plan § T-2A) forthwith to Bank Midwest at the following address: [Street Address for Delivery].

Upon receipt of a conforming request, and unless the Escrow has been served with an order from the Bankruptcy Court presiding over Debtor's case that continues to stay relief for Debtor's default, the Escrow shall deliver the Lieu Deed and Bill of Sale to Bank Midwest, at the street address given in the request, within 48 hours.  The Escrow is neither required nor authorized to consider or assess the accuracy of the statements contained in Bank Midwest's request for delivery (*e.g*., whether Debtor is in default).  Given a conforming request from Bank Midwest, and absent prior service of the requisite stay from the Bankruptcy Court, the Escrow's failure timely to deliver the Lieu Deed and Bill of Sale to Bank Midwest shall be a breach of the Escrow's duty, but—even if the statements in Bank Midwest's request for delivery are not accurate, and unless it has been served with a proper stay—the Escrow shall have no liability for delivery of the Lieu Deed and Bill of Sale to Bank Midwest upon receipt of a conforming request for delivery.  However, if Bank Midwest requests delivery of the Lieu Deed and Bill of Sale with knowledge that such relief is not proper under Plan § T-2A, Debtor may recover damages proximately caused by such an improper request from Bank Midwest.

(j) <u>No Merger</u>:  Neither delivery of the Lieu Deed or Bill of Sale to Bank Midwest, nor recordation or filing of any document, shall effect or cause a "merger" of

any lien preserved under ¶ (1) with or into fee title to any property.  Notwithstanding delivery of the Lieu Deed and Bill of Sale to Bank Midwest, all debt secured by the liens preserved under ¶ (1) shall remain enforceable for purposes of any foreclosure of any such lien that Bank Midwest may consider appropriate to address title issues.  Only an express written reconveyance or release of any such lien shall remove it as a charge against affected property.

     (k) <u>Turnover/Surrender</u>:  If the Lieu Deed and Bill of Sale are delivered to Bank Midwest, Debtor shall immediately turn over and surrender possession and control of the Realty and all Business-related personal property collateral (including, without limitation, all equipment, all inventory, and all cash proceeds not already properly disbursed as compensation to Debtor) to Bank Midwest.  Absent Bank Midwest's express written consent, any further exercise of control over such personal property after a turnover demand shall constitute the tort of conversion.

     (*l*) <u>Debtor's Request for Return of Lieu Deed</u>:  If Debtor fully pays the Class 2A claim in accord with ¶ (6), Debtor may request that the Escrow return the Lieu Deed and Bill of Sale to him.  Such a request must be signed or otherwise authenticated by Debtor or his counsel of record in Debtor's bankruptcy, must be delivered to the Escrow, and must state as follows:

> **Request for Return of Halloum Lieu Deed After Full Payment**
>
> **TO**:  Escrow ("Escrow") under Chapter 11 Plan ("Plan") of Yousif Halloum ("Debtor")
>
> **FROM**:  Debtor
>
> Debtor has fully paid the Class 2A claim in accord with ¶ (6) of Plan § T-2A.  Enclosed with this request please find Bank Midwest's acknowledgment of full payment, authenticated by an officer of Bank Midwest or by Bank Midwest's counsel of record in Debtor's bankruptcy, which must be provided before compliance with this request is permitted or required.
>
> Therefore, Debtor hereby requests that the Escrow deliver the original Lieu Deed and Bill of Sale (as those terms are defined in Plan § T-2A) forthwith to Debtor at the following address: [Street Address for Delivery].

Upon receipt of a conforming request and the prescribed acknowledgment from Bank Midwest, the Escrow shall deliver the Lieu Deed and Bill of Sale to Debtor, at the street address given in the request, within 48 hours, *except* as provided in the balance of this ¶ (6)(*l*).  If the Escrow has any uncertainty about the authenticity of an ostensible full payment acknowledgment from Bank Midwest, the Escrow may defer delivery and request confirmation of such full payment in an email addressed as prescribed in ¶ (9)(a)(ii).  If Bank Midwest disputes full payment, the Escrow shall suspend return of the Lieu Deed and Bill of Sale to Debtor pending direction from the Bankruptcy Court or agreement between the parties.  However, if the Escrow has received no response within two business days after sending such an email soliciting confirmation of Debtor's full payment to Bank Midwest, the Escrow shall treat the ostensible full payment acknowledgment from Bank Midwest as authentic and shall promptly return the Lieu Deed and Bill of Sale to Debtor.  If, after making such an inquiry and receiving no timely

challenge to the asserted full payment, the Escrow returns the Lieu Deed and Bill of Sale to Debtor, then—even if the statements in Debtor's request for return are not accurate—the Escrow shall have no liability for return of the Lieu Deed and Bill of Sale to Debtor, but the Escrow shall be liable to Bank Midwest for damages proximately caused by honoring Debtor's request for return if the statements in Debtor's request are not accurate and either (i) the Escrow did not seek confirmation of full payment from Bank Midwest or sought confirmation and received a timely denial of full payment. If Debtor requests return of the Lieu Deed and Bill of Sale with knowledge that such relief is not proper under Plan § T-2A, Bank Midwest may recover from Debtor for damages proximately caused by such an improper request. Conversely, if Debtor's request is proper but Bank Midwest improperly denies that it has received full payment of the Class 2A claim in accord with ¶ (6), Debtor may recover damages proximately caused by such an improper denial from Bank Midwest.

(m) <u>Other Breaches</u>: If Debtor fails to perform obligations imposed by rights retained under ¶ (3) but such breaches are not among those identified in ¶ (8)(d), the parties' remedial rights and duties shall be as set forth in the documents identified in ¶ (3) or (as to anything not prescribed there) as established under applicable nonbankruptcy law.

(9) <u>Notice Addresses</u>: Unless otherwise specified in Plan § T-2A, communications under § T-2A shall be directed as follows:

(a) If to Bank Midwest:

(i) For hard-copy/physical delivery, addressed to:

Attention: Franklin J. Gardiner
Community Banks of Colorado
5570 DTC Parkway
Greenwood Village, CO  80111

(ii) For email, addressed to:

Franklin J. Gardiner at fgardiner@nbhbank.com

*and*

Alan Scott Koenig at alan@asklaw.com

(b) If to Debtor:

(i) For hard-copy/physical delivery, addressed to:

Yousif H. Halloum
Flag City ARCO & Subway
14931 Flag City Boulevard
Lodi, CA 95242-9313

(ii) For email, addressed to:

Yousif H. Halloum at NOOR123@aol.com

*and*

Hilton A. Ryder at Hilton.Ryder@mccormickbarstow.com

        (c) If to Escrow:

        (i) For hard-copy/physical delivery, addressed to:

Michael J. Kasolas
P.O. Box 26650
San Francisco, CA  94126

        (ii) For email, addressed to:

Michael J. Kasolas at kasolas@7trustee.net
*and*
Scott H. McNutt at smcnutt@ml-sf.com

Any party (*i.e.*, Bank Midwest, Debtor, or the Escrow) may change any of the contact information shown in this ¶ (9) for that party by written notice to the others at their then-applicable email addresses.  Effective on the first regular business day after such a notice has been transmitted, the new mail or email address so provided shall be deemed substituted for the corresponding address shown above.[2]

Obviously, by dropping everything beyond subparagraph (8)(c) of the bank-approved text, Debtor's last two plans undermine his accountability and obliterate the mechanisms designed to assure fair but swift and certain remedies.  (The wholesale deletion also renders numerous cross-references nonsensical, as they point to now-nonexistent provisions.)  This from the same Debtor who is pleading for return to chapter 11 ostensibly because—after stubbornly gambling and losing on "his" way—he's now ready to accept the bank's terms.  If further reason were needed, the latest plans' truncated version of the bank's remedy structure demonstrates once again why reliance on anything Mr. Halloum says is pure folly.  No wonder Bank Midwest rejected his purported post-conversion "conversion" to good-faith cooperation.

        If the case were still in chapter 11, Bank Midwest would vigorously oppose Debtor's fifth amended plan just as it would have all the prior versions.  For at least the reasons given in its motion to convert (Doc 449, p. 3), Bank Midwest submits that Debtor cannot confirm any colorably plausible plan to which the bank objects, and there is now no plan that Bank Midwest would accept.

---

[2] Bank Midwest's draft included hyper-linking of email addresses and some highlighting of tentative text, both omitted here, and it also specified: "In the provision for treatment of the Class 3A claim, the word 'treated' replaces 'paid.'"  Debtor's amended plan ignored that change, which was intended to make clear that, insofar as the bank's claim is secured by personalty, plan would incorporate *all* the treatment terms applicable to realty-backed claim—including the remedy structure—not just the payment regimen.

Meanwhile, since the conversion order, the Trustee has expended his own and others' time, effort, and money to acquire effective control of Debtor's business and assets. During the same interval, the Trustee and Bank Midwest have devoted many hours to working out detailed terms on which the Trustee will pursue going-concern sale of the business. Among other things, those arrangements (for which Court approval will shortly be sought) call for prescribed discounting and subordination of Bank Midwest's secured claim, and they contemplate that the bank will provide significant new financing to afford necessary operating capital. In other words, consistent with the limited shelf-life of assets like good will, there has already been a lot invested in gearing up for the Trustee's optimal chapter 7 administration. To abort that mission so that Debtor can again spin his (and others') wheels ad nauseum in chapter 11 would be quixotic at best.

## **Conclusion**

The impasse that impelled the Court's conversion order was broken by that order, and this bankruptcy is now moving toward sensible resolution. Debtor's prospects for contested confirmation were virtually nil before conversion, and the addition of chapter 7 administrative costs very likely puts even threshold feasibility beyond reach.[3] Bank Midwest, which holds far and away the largest secured and unsecured claims in this case, has already endured two years' delay and hundreds of thousands of dollars in legal expense, both greatly exacerbated by Debtor's intractably irresponsible conduct. Enough.

Respectfully submitted,

Dated: February 24, 2014        KATZEN & SCHURICHT

By     /s/     David I. Katzen
David I. Katzen
Attorneys for Bank Midwest, N.A.

---

[3] Before conversion, the argument for Effective Date feasibility turned on the willingness of Debtor's long-unpaid reorganization counsel—whom he has since fired and threatened to sue—to subordinate and defer his fees. One might question whether Mr. Ryder's firm would still be so accommodating. In his fifth amended plan, Debtor seems to call for a family infusion of $250,000, the reality and sufficiency of which are also open to question. What's clear is that he or his family were previously *not* so forthcoming. Again, it seems Mr. Halloum is always playing some angle, and those spots won't change.